**KAZEROUNI LAW GROUP, APC**
Ryan L. McBride, Esq. (SBN: 297557)
ryan@kazlg.com
Nadir O. Ahmed (SBN: 290810)
nadir@kazlg.com
2221 Camino Del Rio S., #101
San Diego, CA 92108
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**MADAR LAW CORPORATION**
Alex S. Madar, Esq. (SBN: 319745)
alex@madarlaw.net
11510 Eaglesview Ct.
San Diego, CA 92127
Telephone: (858) 299-5879
Facsimile: (619) 354-7281

*Attorneys for Plaintiff,*
Kyle Miholich

KAZEROUNI LAW GROUP, APC

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

KYLE MIHOLICH, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

OJO LABS INC., OJO HOME LLC, MOVOTO, INC., CHRISTOPHER JOSEPH HELLER, THE HELLER REAL ESTATE GROUP, INC., ,

Defendants.

Case No.: 3:26-cv-01732-GPC-DDL

**FIRST AMENDED CLASS ACTION COMPLAINT**

**VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C §§ 227, *ET SEQ.***

**DEMAND FOR JURY TRIAL**

KAZEROUNI LAW GROUP, APC

Plaintiff KYLE MIHOLICH ("Plaintiff"), individually and on behalf of the proposed Class defined below, brings the following class action complaint against OJO Labs Inc., OJO Home LLC dba Movoto, Movoto, Inc. (jointly as the "OJO Defendants"), Christopher Joseph Heller ("Defendant Heller"), The Heller Real Estate Group, Inc. ("Heller Group") (jointly as the "Heller Defendants") (collectively "Defendants"). Plaintiff alleges as follows:

## INTRODUCTION

1. OJO Defendants operate one of the largest real-estate technology companies and brokerages in North America, providing real estate technology services to real estate agents both within and outside of their brokerage, as well as numerous technology and search services for prospective home-buyers and home-sellers through their real estate search website "Movoto.com".

2. OJO Defendants contract with thousands of real estate agents and brokerages across the country ("Contracted Agents") who drive business for OJO Defendants by securing leads in the form of telephone numbers from OJO Defendants and turning those leads into home sales, from which OJO Defendants earn a percentage of commission.

3. One way that these Contracted Agents drive home sales for OJO Defendants is to "cold call" or "cold text" residential and cellular telephone numbers from leads provided by OJO Defendants directly to market their real estate services to the call and/or text recipients.

4. Alternatively, through OJO Defendants' various agent service platforms including, but not limited to, "Movoto Pro+" and "Lever by Movoto", OJO Defendants also take direct control of their Contracted Agents' CRM and/or phone software programs, provide telephone numbers and leads directly to their Contracted Agents,

KAZEROUNI LAW GROUP, APC

and then share commissions with the agent upon close of any real estate transaction resulting from the telemarketing calls and texts sent to the prospective leads sourced by the OJO Defendants[1].

5. For calls placed by OJO Defendants' Contracted Agents, Heller Defendants not only authorize and ratify the agents' practice of cold calling or cold texting residential and cellular telephone numbers directly, they also welcome the financial benefits of the increased home sales and website visits that the cold calls and texts generate.

6. In their zeal to find clients and get more commissions, the Defendants have failed to take sufficient precautions to ensure they or the agents and brokerages they contract with do not engage in harassing telephone practices.

7. In particular, Defendants have failed to adopt sufficient procedures to ensure that either they or their Contracted Agents do not call potential customers who are not on the National Do Not Call Registry ("NDNCR"). This practice violates the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"), and its implementing regulations.

8. To increase their revenues, Defendants utilize, and encourage and permit their Contracted Agents to partner with various artificial intelligence ("AI"), autodialing and auto-texting companies and platforms, including those platforms created by OJO Defendants, which in turn provide the Contracted Agents with the capacity to harass a larger number of people with unwanted calls and texts.

9. The Contracted Agents make these cold calls and texts on behalf of and as agents of OJO Defendants for reasons including but not limited to the following:

a. OJO Defendants profit from every home sale made by each Contracted Agent and have a financial interest in ensuring the Contracted Agents can market themselves widely and quickly.

---

[1] See Lever by Movoto Terms of Service published at https://lever.movoto.com/terms-and-conditions (last accessed April 23, 2025).

b. It is OJO Defendants that design the Contracted Agents' cold calling/texting policies and oversee and provide agent training, and they have either neglected to design, or designed and weakly implemented an insufficient process for "compliance" with the TCPA, which they know the agents fail to follow. In the event a TCPA compliance process was put in place, Defendants have authorized and ratified the Contracted Agents' failure to follow the TCPA "compliance" process they designed.

c. Defendants know of, approve, and ratify the agents' conduct in connection with making the cold calls and texts at issue, including the following: (1) the agents' use of Defendants' intellectual property, such as the "Ojo", "Ojo Home", or "Movoto" brand names; (2) the agents' use of telephone numbers supplied by Defendants; and (3) the agents' use of texting and cold-calling platforms to make the calls and texts.

10. Plaintiff and thousands of people nationwide are victims of Defendants' reckless cold calling and texting practices. They received numerous unwanted marketing calls and texts that were for the purpose of advertising both the Defendants' and Contracted Agents' real estate business. These calls and texts were placed without regard to anyone's status on the NDNCR and without regard to prior complaints made to any Defendant or contracted agent.

11. Because Defendants engage in and profit from pervasive cold calling and texting that results in violations of the TCPA, Plaintiff brings this class action complaint for damages, restitution, injunctive relief, and any other available legal or equitable remedies, resulting from Defendants' unlawful calls and texts to their residential and mobile telephone lines, in violation of the TCPA.



KAZEROUNI LAW GROUP, APC

## JURISDICTION AND VENUE

12. This Court has federal question subject matter jurisdiction over this class action lawsuit pursuant to 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute, the TCPA.

13. The Court has personal jurisdiction over Defendants because Defendants conduct significant business in this District, and the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated from this District.

14. This Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because Plaintiff and the members of the Class have suffered aggregate damages exceeding $5,000,000, exclusive of interests and costs, and this case is a class action in which a member of the Classes is a citizen of a state different from Defendants.

15. Venue is proper in the United States District Court for the Southern District of California pursuant to 18 U.S.C. § 1391(b) because Defendants are subject to personal jurisdiction in the County of San Diego, State of California as not only do Defendants regularly conduct business throughout the State of California, but Plaintiff resides within the State of California, County of San Diego.

## PARTIES

16. Plaintiff is, and at all times mentioned herein was, a citizen and resident of the State of California, County of San Diego. Plaintiff is, and at all times mentioned herein was, a "person," as defined by 47 U.S.C. § 153(39).

### Defendant Ojo Labs Inc.

17. Defendant Ojo Labs Inc. is the parent corporation of Ojo Home LLC dba Movoto and Movoto Inc., which it acquired on June 24, 2020.[2]

---

[2] https://ojo.com/article/news-room/3RJy9IcqbWHvMEkH8h25bh (last accessed April 23, 2025)



KAZEROUNI LAW GROUP, APC

18. Ojo Labs Inc.'s principal place of business and headquarters is located at 1007 S Congress, Building 9, Suite 400, Austin, TX 78704.

19. Defendant Ojo Labs Inc. is, and at all times mentioned herein was a "person," as defined by 47 U.S.C. § 153(39).

20. Plaintiff alleges that at all times relevant herein Defendant Ojo Labs Inc. conducted business in the State of California and in the County of San Diego, and within this judicial district.

**Defendant Ojo Home LLC dba Movoto**

21. Defendant Ojo Home LLC dba Movoto is a Texas limited liability company and wholly owned subsidiary of OJO Labs, Inc.

22. Ojo Home LLC dba Movoto's principal place of business and headquarters is located at 1007 S Congress, Building 9, Suite 400, Austin, TX 78704.

23. Defendant Ojo Home LLC dba Movoto is, and at all times mentioned herein was a "person," as defined by 47 U.S.C. § 153(39).

24. Plaintiff alleges that at all times relevant herein Defendant Ojo Home LLC dba Movoto conducted business in the State of California and in the County of San Diego, and within this judicial district.

**Defendant Movoto, Inc.**

25. Defendant Movoto, Inc. is a California corporation and wholly owned subsidiary of OJO Labs, Inc.

26. Movoto Inc's principal place of business and headquarters is listed as 1007 S Congress, Building 9, Suite 400, Austin, TX 78704.

27. Defendant Movoto Inc. is, and at all times mentioned herein was a "person," as defined by 47 U.S.C. § 153(39).

28. Plaintiff alleges that at all times relevant herein Defendant Movoto Inc. conducted business in the State of California and in the County of San Diego, and



KAZEROUNI LAW GROUP, APC

within this judicial district.

**<u>Defendant Christopher Joseph Heller</u>**

29. Defendant Heller was the President of both Defendant OJO Labs Inc. and Defendant Ojo Home LLC dba Movoto, and has acted in a leadership capacity for both the OJO Defendants since during the relevant time period.[3]

30. Defendant Heller is an active real-estate agent and broker, and manages a team of 13 real estate agents in Encinitas, CA through Heller Group under the fictitious name "Heller the Home Seller".[4] Defendant Heller owned the Heller Real Estate Group, Inc. during the relevant time period.

31. Defendant Heller is, and at all times mentioned herein was a "person," as defined by 47 U.S.C. § 153(39).

32. Plaintiff alleges that at all times relevant herein Defendant Heller conducted business in the State of California and in the County of San Diego, and within this judicial district.

**<u>Defendant The Heller Real Estate Group, Inc.</u>**

33. Defendant The Heller Real Estate Group, Inc. is a California corporation with its principal place of business located at 111 C St., Unit 107, Encinitas, CA 92024. Plaintiff alleges that at all times relevant herein, Heller Group conducted business in the State of California and in the County of San Diego, and within this judicial district.

## <u>FACTUAL BACKGROUND</u>

### A. Overview of the TCPA

34. In 1991, Congress enacted the TCPA to regulate the explosive growth of

---

[3] https://www.housingwire.com/articles/49594-chris-heller-leaves-loandepot-and-mellohome-for-ai-real-estate-company-ojo-labs (last accessed April 23, 2025).
https://www.housingwire.com/articles/ojo-promotes-chris-heller-to-president (last accessed April 23, 2025).

[4] https://hellerthehomeseller.com/team-page (last accessed April 23, 2025)



KAZEROUNI LAW GROUP, APC

the telemarketing industry. In doing so, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy…." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(5) (1991) (codified at 47 U.S.C. § 227).

35. The TCPA was designed to prevent calls and messages like the one described within this complaint, and to protect the privacy of citizens like Plaintiff. "Voluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

36. Specifically, the TCPA restricts telephone solicitations (*i.e.,* telemarketing) and the use of automated telephone equipment, as well as violations of the TCPA's National Do-Not-Call provision of 47 C.F.R. § 64.1200(c).[5] The TCPA limits the use of automatic dialing systems, artificial or prerecorded voice messages, SMS text messages, and fax machines. It also specifies several technical requirements for fax machines, autodialers, and voice messaging systems–principally with provisions requiring identification and contact information of the entity using the device to be contained in the message.

37. In 2003, the FCC promulgated regulations that created the National Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c)(2). The NDNCR is a list containing the residential and cellular telephone numbers of individuals who affirmatively indicate they do not wish to receive unsolicited calls from commercial telemarketers. Do not call registrations must be honored indefinitely. *Id.*

38. In addition to its broad prohibition on calls to any number listed on the NDNCR, the TCPA prohibits *any* telemarketing call "unless such [entity] has instituted procedures for maintaining a list of persons who request not to receive telemarketing

---

[5] According to the Federal Communications Commission's website, https://www.fcc.gov/consumers/guides/wireless-phones-and-national-do-not-call-list, accessed on June 3, 2021: Placing telemarketing calls to wireless phones is - and always has been - illegal in most cases.



KAZEROUNI LAW GROUP, APC

calls by or on behalf of that [company]." §64.1200(d). The "minimum standards" for these procedures include training of personnel engaged in marketing on the existence and use of an internal do-not-call list, placing an individual's phone number on that internal do-not-call list, and honoring that request within no more than 30 days of its receipt. *Id.* An entity violates the TCPA if it initiates a phone call without having implemented the minimum procedures.

39. Today, 230 million telephone numbers are on the National Do Not Call Registry.[6]

40. Despite the widespread embrace of the NDNCR, companies like Defendants flagrantly ignore the Registry and invade the privacy of consumers with unwanted calls.

41. In enacting the TCPA, Congress intended to give consumers a choice as to how creditors and telemarketers may call them and made specific findings that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." TCPA, Pub.L. No. 102-243, § 11. Toward this end, Congress found that:

> Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

*Id.* at § 12; *see also, Martin v. Leading Edge Recovery Solutions, LLC*, 2012 WL 3292838, at *4 (N.D. Ill. Aug. 10, 2012) (citing Congressional finding on TCPA's purpose).

42. Congress also specifically found that "the evidence presented to the

[6] Simon van Zuylen-Wood, *How Robo-callers Outwitted the Government and Completely Wrecked the Do Not Call List,* WASH POST (MAGAZINE), Jan. 11, 2018, *available at* https://www.washingtonpost.com/lifestyle/magazine/how-robo-call-moguls-outwitted-the-government-and-completely-wrecked-the-do-not-call-list/2018/01/09/52c769b6-df7a-11e7-bbd0-9dfb2e37492a_story.html (last accessed June 10, 2024).



KAZEROUNI LAW GROUP, APC

Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call […].” *Id.* At §§ 12-13; *see also, Mims*, 132 S. Ct. at 744.

43. As Judge Easterbrook of the Seventh Circuit explained in a TCPA case regarding calls to a non-debtor similar to this one:

> The Telephone Consumer Protection Act […] is well known for its provisions limiting junk-fax transmissions. A less litigated part of the Act curtails the use of automated dialers and prerecorded messages to cell phones, whose subscribers often are billed by the minute as soon as the call is answered – and routing a call to voicemail counts as answering the call. An automated call to a landline phone can be an annoyance; an automated call to a cell phone adds expense to annoyance.

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir. 2012).

44. Text messages are calls and are subject to the TCPA. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). *See also FCC Declaratory Ruling 23-107* (Dec 13, 2023) (clarifying that text messages are protected just as voice calls under 47 U.S. Code § 227(c) "We adopt our proposal to codify the National DNC Registry's existing protections to text messages", and further commenting "it would be anomalous to conclude that text messages to wireless numbers are “calls” for one part of the Commission’s TCPA rules but not for the DNC protections".) *FCC 23-107 (3)(B)*.

45. 47 C.F.R. § 64.1200(a)(2) additionally states, with respect to advertisement and telemarketing calls—of which Defendant’s texts to Plaintiff are—that “[n]o person or entity may . . . [i]nitiate or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party …”



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

46. 47 C.F.R. § 64.1200(f)(8) defines "prior express written consent" as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered."

47. As of October 16, 2013, unless the recipient has given *prior express written consent*,[7] the TCPA and Federal Communications Commission ("FCC") rules under the TCPA generally:

- Prohibit solicitors from calling residences before 8 a.m. or after 9 p.m., local time.
- Require that solicitors provide their name, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which that person or entity may be contacted.
- Prohibit solicitations to residences that use an artificial voice or a recording.
- Prohibit any call or text made using automated telephone equipment or an artificial or prerecorded voice to a wireless device or cellular telephone.
- Prohibit any call made using automated telephone equipment or an artificial or prerecorded voice to an emergency line (*e.g.*, "911"), a hospital emergency number, a physician's office, a hospital/health care facility/elderly room, a cellular telephone, or any service for which the recipient is charged for the call.

[7] Prior express written consent means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8).

- Prohibit autodialed calls that engage two or more lines of a multi-line business.
- Prohibit unsolicited advertising faxes.
- Prohibit certain calls to members of the National Do-Not Call Registry.

48. Furthermore, in 2008, the FCC held that "a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act, Declaratory Ruling on Motion by ACA International for Reconsideration*, 23 FCC Rcd. 559, 565, ¶ 10 (Jan. 4, 2008); *Birchmeier v. Caribbean Cruise Line, Inc.*, 2012 WL 7062748 (N.D. Ill., Dec. 31, 2012).

49. The TCPA also provides that liability should be imposed when calls are made on behalf of an entity or person. 47 U.S.C. § 227(c)(5). In its implementing regulations and interpretations, the FCC has determined that this statutory mandate is broad, and that vicarious liability applies where there is apparent authority, actual authority, ratification, or, under the express terms of § 227(c), when unlawful calls are placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network*, 28 FCC Rcd. 6574 (2013).

50. Accordingly, the entity can be liable under the TCPA for a call made on its behalf, even if the entity did not directly place the call. Under those circumstances, the entity is deemed to have initiated the call through the person or entity.

51. Additionally, a corporate officer can be held personally liable under the TCPA for a business' violative calls. "A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985) (internal quotation marks and citation omitted). *See also* Dawson et al v. Porch.com Inc



KAZEROUNI LAW GROUP, APC

et al, No. 3:2024cv07974 – Document 147 (N.D. Cal 2024) (denying Defendant's Motion to Dismiss as to personal liability of corporate officer under the TCPA when Plaintiff alleged that the corporate officer "knowingly participated in, authorized, built, and directed" the unlawful telemarketing scheme at issue).

52. With respect to misdialed or wrong-number calls, the FCC recently clarified that "callers who make calls without knowledge of reassignment and with a reasonable basis to believe that they have valid consent to make the call should be able to initiate one call after reassignment as an additional opportunity to gain actual or constructive knowledge of the reassignment and cease future calls to the new subscriber." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, FCC 15–72, 30 F.C.C.R. 7961, ¶¶ 71-72 (July 10, 2015). "If this one additional call does not yield actual knowledge of reassignment, we deem the caller to have constructive knowledge of such." *Id.* Thus, any second call placed to a wrong number violates the TCPA.

53. The TCPA provides for damages in the amount of $500 for each negligent violation and $1,500 for each knowing violation. *See* 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5).

### B. Defendants Have Executed a Nationwide Cold Calling and Cold Texting Scheme That Has Unlawfully Harassed People Around the Country.

#### i. Defendants Operate a Large Real Estate Brokerage and Real Estate Technology Company That Directs and Supervises Agents to Sell Real Estate Under Their OJO/Movoto Brand on Their Behalf.

54. Defendant OJO Labs Inc., along with its wholly owned subsidiaries OJO Home LLC dba Movoto and Movoto, Inc. operate the second largest online real estate brokerage in the United States, and is the only one licensed in all 50 states.[8]

[8] https://help.movoto.com/is-movoto-real-estate-a-brokerage (last accessed April 25, 2025).





KAZEROUNI LAW GROUP, APC

55. OJO Defendants provide technology and lead generation services to thousands of real estate agents and brokerages through various programs including "Movoto Pro+", "Lever by Movoto", and the "Movoto Select Network".

56. As of April 25, 2025, OJO Defendants represent that over 25,000 agents operate within the Movoto Select Network.

57. Each Contracted Agent affiliates with one or more of the OJO Defendants and holds themself out as a real estate agent under the Movoto/OJO brand. The Defendants allow each of the Contracted Agents to have a designated webpage that lists the Agent's contact information, short biography, and the homes for which they represent Movoto. People interested in buying and selling homes in a specific geographic area can find a Contracted Agent by searching the Movoto website to help them do so. When a home is sold, the payment is purportedly received by the OJO Defendants; then OJO Defendants pays the Contracted Agent a commission while the OJO Defendants also receive a portion of the profit.

58. To become a Contracted Agent and be able to help people buy and sell homes through the Movoto brand, a person must first apply and be accepted for such a role by the OJO Defendants. In other words, individuals cannot just simply decide to hold themselves out as being a Movoto representative; instead, every Contracted Agent has received an affirmative authorization from the OJO Defendants to hold themselves out as such.

59. Because homeowners typically only contract with one real estate brokerage to assist them in selling their homes, and competition in the real estate market is fierce, OJO Defendants have an incentive to obtain as many home listings as possible to increase their profits.

60. Moreover, if a real estate brokerage has a large share of the listings for homes for sale in a given geographic market at a given time, it can use its market power to raise the prices on the homes it has for sale, since fewer competing listings can undercut the real estate brokerage with lower home prices. Due to OJO Defendants' large number



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

of affiliated agents, they are able to capture large shares of the market in given regions, and they have tremendous incentive to obtain more and more home listings to be able to keep real estate prices high.

61. The Contracted Agents do not operate independently. Rather, each one operates in accordance with the OJO Defendants' policies and procedures to ensure continuity in customer service, and to protect the reputation of the Movoto brand, which, in turn, ensures more profits for the OJO Defendants.

**ii. Defendants Know That the Contracted Agents Engage in Cold Calling to Sell Real Estate on Their Behalf.**

62. Defendants know that it is standard practice in the real estate field to use cold calling and telephone solicitation to generate new business, and they know and expect that their Contracted Agents will employ these strategies when selling real estate on their behalf.

63. As is typical to the industry and known to Defendants, Contracted Agents often scan real estate listings that are from competitors, are for sale by owner ("FSBO"), or are expired to identify individuals who might be in the market for a new real estate agent, and they cold call these homeowners to try to convince them to retain the Agent to list the property.

64. Contracted Agents also prospect for potential home buyers or sellers by cold calling homeowners or renters in targeted geographic areas, including in the vicinity of existing listings, open houses, or recent sales. Defendants provide training on and give Contracted Agents access to various lead generation services which allows Contracted Agents to download residents' contact information, including phone numbers, to make such geo-targeted cold calls.

65. Contracted Agents can also sign up for other services that provide them with leads and contact information. As is common to the industry, Contracted Agents will mine other sources of information for potential home buyers' or sellers' phone

numbers, for example, by forming relationships with third parties who supply the Contracted Agents with phone numbers.

66. OJO Defendants also provide leads directly to the Contracted Agents which have been sourced through various avenues, but fail to scrub these leads against the National Do Not Call Registry.

67. Contracted Agents, like others in the industry, also search for prospective homebuyers, often buying lists of prospective customers from real estate aggregator services, such zillow.com or realtor.com.

68. OJO Defendants also take over the Contracted Agents' dialing technology through remote access granted to the OJO Defendants, and directly place telemarketing calls and texts for the Contracted Agents from lists of phone numbers stored within the dialing system.

### iii. Defendants Know, Ratify, and Authorize Their Agents to Use Autodialing Software to Dial Millions of Numbers.

69. Because placing individual calls one by one often can be cumbersome and time consuming, those working to drive business in the real estate industry often use autodialer platforms.

70. Autodialers provide software that permits businesses to: (1) increase the number of people they call in a given time period, and (2) deliver both prerecorded messages and text messages on a widespread basis to large numbers of recipients over the phone.

71. By using autodialing, callers can reach far more people than they would if they were directly calling or texting.

72. As a result, the use of autodialers is common in the real estate industry.

#### a. Defendants Know, Ratify, and Authorize the Use of Autodialing Software by Contracted Agents to Increase Their Profits.





KAZEROUNI LAW GROUP, APC

73. OJO Defendants know, authorize, and ratify the Contracted Agents' usage of autodialing systems and software.

74. First, as set forth in Paragraphs 68-71, use of autodialers is common in the sales and real estate industries. OJO Defendants, as leaders in the real estate field, are familiar with sales practices and this trend, and actively promote the use of autodialing platforms.

75. Additionally, OJO Defendants promote and provide online training programs to the Contracted Agents, while knowing those training programs both encourage and instruct agents on the use of autodialers. OJO Defendants know its agents attend these workshops, and OJO Defendants suggest that Contracted Agents attend.

**iv. Defendants Routinely Violate the TCPA with Harassing Phone calls to People on the National Do Not Call Registry**

76. Defendants' business practices violate the TCPA, as they cause people to be called and texted often repeatedly, notwithstanding the fact that their numbers are listed on the National Do Not Call Registry ("NDNCR").

77. The FCC's regulations at 47 C.F.R. § 64.1200(c)(2) prohibit Defendants from placing calls or texts to numbers on the NDNCR, but Defendants do nothing to ensure that the Contracted Agents do not place any such calls. Defendants know that their cold-calling practices have caused and will cause unwanted calls to people on the NDNCR but allow the calls to continue to increase their profits.

78. When Contracted Agents place calls and texts through an autodialer platform, including but not limited to platforms recommended by and/or partnered with by OJO Defendants, and regardless of whether these calls are placed by OJO Defendants or the Contracted Agents, Contracted Agents call people on the NDNCR in violation of 47 U.S.C. § 64.1200(c)(2). OJO Defendants do not vet lists provided to and used by Contracted Agents to dial by comparing them to the NDNCR.



KAZEROUNI LAW GROUP, APC

79. OJO Defendants have not taken adequate steps to prevent Contracted Agents from calling people on the NDNCR. OJO Defendants have not adopted sufficient written procedures, training programs, or a process that they know will actually prevent Contracted Agents from calling numbers on the NDNCR.

80. OJO Defendants' written procedures are inadequate and do not comply with 47 U.S.C. § 64.1200(c)(2)(i)(A).

81. OJO Defendants' training is inadequate and does not comply with 47 U.S.C. § 64.1200(c)(2)(i)(B).

82. OJO Defendants do not maintain and record a list of telephone numbers that their Contracted Agents may not contact pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(C).

83. OJO Defendants do not use any process to prevent telephone solicitations of any number on the NDNCR and do not maintain records documenting their process pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(D), or to the extent they attempt to use such processes, they remain out of compliance with NDNCR regulations.

### C. Plaintiff Kyle Miholich's Experience

84. Plaintiff Kyle Miholich's cell phone number ending in 5823 was placed on the National Do Not Call Registry on October 27, 2006.

85. Mr. Miholich uses his cell phone number for personal use only - and did so at the time he was sent text messages by the OJO and Heller Defendants. Despite this fact, Mr. Miholich was texted multiple times by the OJO and Heller Defendants to see if he was interested in engaging Defendant Heller's services as a listing agent.

86. Mr. Miholich received an unwanted telemarketing text message from Defendants on September 12, 2024 from phone number (760) 230-9886, which read:

> "A home in your neighborhood just sold! Want the full listing report? Click to access: https://mve.re/go/3/epWg7. Don't care about your neighbors moving? Reply STOP"

87. Mr. Miholich received a SECOND unwanted telemarketing text message from Defendants on September 26, 2024 from phone number (760) 230-9886, which read:

> "Your neighbor's home just listed! How does YOUR home compare? Click here: https://mve.re/go/2/B52gY. Not interested in receiving property alerts? Reply STOP"

88. Mr. Miholich received a THIRD unwanted telemarketing text message from Defendants on November 24, 2024 from phone number (760) 230-9886, which read:

> "A home in your neighborhood just listed! Want the full listing report? Click here to access: https://mve.re/go/3/5kNeW Don't care about your neighbors moving? Reply STOP"

89. Mr. Miholich received a FOURTH unwanted telemarketing text message from Defendants on December 4, 2024 from phone number (760) 230-9886, which read:

> "Your neighbor's home just listed! How does YOUR home compare? Click here: https://mve.re/go/2/g9Vek. Not interested in receiving property alerts? Reply STOP"

90. Mr. Miholich received a FIFTH unwanted telemarketing text message from Defendants on January 16, 2025 from phone number (760) 230-9898, which read:

> "Your neighbor's home just listed! How does YOUR home compare? Click here: https://mve.re/go/3/nr5We. Not interested in receiving property alerts? Reply STOP"

91. Each of the unwanted telemarketing text messages sent by Defendants contained a unique hyperlink which, when clicked, directs to an AI generated webpage showing a valuation of a recently sold or listed real estate listing; a prominent display of the "Movoto by OJO" logo; Defendant Heller's picture and contact information; as well as several paragraphs touting Defendant Heller's prominence and success within the real estate industry.



KAZEROUNI LAW GROUP, APC

92. Each AI generated webpage also includes the written instructions "chat with me today about how I can get top dollar for your home in this market" and "Call/Text Chris for your private showing".




93. In his capacity as a real-estate salesperson and agent for the OJO Defendants, and as an officer and agent of Heller Group, Defendant Heller personally

caused each text message to be sent to Plaintiff on behalf of the OJO Defendants and Heller Group for the purpose of securing the sales listing of Plaintiff's home.

94. In his capacity as President of the OJO Defendants, Defendant Heller knowingly participated in, authorized, implemented, and directed the deployment and usage of the specific lead generation and cold texting technologies used to contact both Plaintiff and the Proposed Class.

95. At the time that these texts were placed to Plaintiff's cell phone by Defendant Heller, Defendant Heller was a licensed real estate agent who conducted real estate activities in the name of Movoto Inc., his registered broker.[9]

96. Such text messages constitute telephone solicitations pursuant to 47 C.F.R. § 64.1200(c), as they were an attempt to promote or sell Defendants' services. Specifically, all five text messages were sent on behalf of Defendants and were intended to solicit and secure the sales listing for Mr. Miholich's home.

97. The text messages were impersonal and did not reference Mr. Miholich by name, suggesting the text messages were sent *en masse* via a text autodialer platform from a stored list of phone numbers.

98. Mr. Miholich never gave Defendants nor any OJO or Contracted Agent, including Mr. Heller, consent to call or text him.

99. Mr. Miholich did not have an established business relationship with either Mr. Heller or the OJO Defendants during the time of the telephone solicitations.

## ARTICLE III STANDING

100. Defendants sent multiple text messages to Plaintiff's personal cellular telephone which was registered on the National Do-Not-Call Registry. Such unwanted text messages from Defendants are a nuisance, an invasion of privacy, and wasted

[9] According to the State of California Department of Real Estate, Movoto Inc. was Defendant Heller's responsible broker of record from April 26, 2021 through March 25, 2025.



KAZEROUNI LAW GROUP, APC

Plaintiff's time and enjoyment in use of his personal cellular telephone. All three of these injuries are concrete and *de facto*.

101. Furthermore, Plaintiff was distracted, inconvenienced, and annoyed by having to take time to open and read each text message.

102. All of these injuries are particularized and specific to Plaintiff, and will be the same or substantially similar injuries suffered by each member of the putative class.

103. The above text messages were linked to Defendants as they were sent on behalf of OJO Defendants, Heller Group, and Defendant Heller, and their employed agent and corporate executive, who are the parties that attempted to solicit business from Plaintiff for their financial benefit. These text messages are the sole source of Plaintiff's and the Class's injuries. Therefore, Plaintiff has illustrated facts that show that his injuries are traceable to the conduct of Defendants.

104. Plaintiff's Request for Relief includes a request for damages for each text message and telephone call made by Defendants to cellular numbers on the National Do-Not Call Registry, as authorized by statute in 47 U.S.C. § 227, *et seq*. The statutory damages were set by Congress and specifically redress the damages suffered by Plaintiff and the members of the putative class.

## CLASS ACTION ALLEGATIONS

105. Plaintiff brings this action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of the following class, of which Plaintiff is a member, which is defined as follows:

> **National Do-Not Call Nationwide Class**:
> All persons within the United States (1) registered on the National Do-Not-Call Registry for at least 30 days, (2) who received more than one call or text message (3) made or sent by or on behalf of Defendants, (4) for the purpose of promoting Defendants' goods or services, (5) within any



KAZEROUNI LAW GROUP, APC

twelve-month period, (6) within the four years prior to the filing of the Complaint.

106. Excluded from the Class are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

107. Plaintiff reserves the right to redefine the class and to add subclasses as appropriate based on discovery and specific theories of liability.

108. Plaintiff and members of the Class were harmed by the acts of Defendants in at least the following ways: Defendants, either directly or through its agents, illegally contacted Plaintiff and the Class members via their telephones, whether cellular telephones or otherwise, for solicitation purposes, thereby invading the privacy of said Plaintiff and the Class members whose cellular telephone numbers were on the National Do-Not-Call Registry. Plaintiff and the Class members were damaged thereby.

109. Numerosity: Upon information and belief, the members of the classes are so numerous that joinder of all of them is impracticable.

110. The exact number of the members of the classes is unknown to Plaintiff at this time, and can (and will) be determined through appropriate discovery. However, given that, on information and belief, Defendants texted and called thousands of class members nationwide during the class period, it is reasonable to presume that the members of the Class are so numerous that joinder of all members is impracticable. The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.

111. Ascertainability: The members of the class are ascertainable because the class is defined by reference to objective criteria.

112. In addition, the members of the class are identifiable in that, upon information and belief, their cellular telephone numbers, names and addresses can be identified in business records maintained by Defendants and by third parties.

KAZEROUNI LAW GROUP, APC

113. Typicality: As a person who received numerous telephone solicitations from Defendants within a 12-month period, who did not have an established business relationship or personal relationship with Defendants, and who did not provide Defendants prior express invitation or permission to receive telephone solicitations, Plaintiff is asserting claims that are typical of the Class. Plaintiff will fairly and adequately represent and protect the interests of the Class in that Plaintiff has no interests antagonistic to any member of the Class.

114. Plaintiff's claims are typical of the claims of the members of the class. Plaintiff has had to suffer the burden of receiving unwanted text messages to his cellular telephone, despite his phone number having been registered on the National Do-Not Call Registry. Thus, his injuries are typical to Class Members.

115. Plaintiff's claims, and the claims of the members of the class, originate from the same conduct, practice and procedures on the part of Defendants.

116. Plaintiff's claims are based on the same theories, as are the claims of the members of the class.

117. Adequacy: Plaintiff is qualified to, and will fairly and adequately protect the interests of the members of the class with whom he is similarly situated, as demonstrated herein. Plaintiff acknowledges that he has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member.

118. Plaintiff's interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the class.

119. Plaintiff will vigorously pursue the claims of the members of the class.

120. Plaintiff has retained counsel experienced and competent in class action litigation. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. In addition, the proposed class counsel is experienced in handling claims involving consumer actions and violations of the TCPA.

121. Plaintiff's counsel will vigorously pursue this matter.

122. Plaintiff's counsel will assert, protect and otherwise represent the members of the class.

123. Plaintiff has incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member.

124. Predominance: The questions of law and fact common to the members of the class predominate over questions that may affect individual members of the class. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to the Class rather than individual to its members.

125. Commonality: There are common questions of law and fact as to all members of the Class, including but not limited to the following:

a. What is Defendants' conduct, pattern, and practice as it pertains to delivering advertisement and telemarketing text messages and phone calls;
b. Whether, within the four years prior to the filing of this Complaint, Defendants or their agents sent more than one text message or phone call to the members of the Class whose telephone numbers were on the National Do-Not-Call Registry and who had neither an established business relationship nor personal relationship with Defendants;
c. Whether Defendants obtained prior express written consent to send the text messages or calls to Plaintiff or the Class members' telephones;
d. Whether Defendants' calls or texts were made for an emergency purpose;
e. Whether Defendants have established written procedures to comply with National Do Not Call Registry registrations;
f. Whether Defendants train personnel on any procedures to comply with National Do Not Call Registry regulations;

KAZEROUNI LAW GROUP, APC

g. Whether Defendants use any process to prevent telephone solicitations of any number on the National Do Not Call Registry and maintaining records documenting the process;

h. Whether Defendants' conduct violated the TCPA, and availability of statutory penalties;

i. Whether Defendants maintain and record a list of telephone numbers that they may not contact;

j. Whether Plaintiff and the Class members were damaged thereby, and the extent of damages for such violation; and

k. Whether Defendants should be enjoined from engaging in such conduct in the future.

126. Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this matter because:

- If brought and prosecuted individually, the claims of the members of the class would require proof of the same material and substantive facts.
- The pursuit of separate actions by individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class, and could substantially impair or impede their ability to protect their interests.
- The pursuit of separate actions by individual members of the class could create a risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendants.
- These varying adjudications and incompatible standards of conduct, in connection with presentation of the same essential facts, proof, and legal theories, could also create and allow the existence of inconsistent and incompatible rights within the class.
- The damages suffered by each individual member of the class may be relatively modest, thus, the expense and burden to litigate each of their



KAZEROUNI LAW GROUP, APC

claims individually make it difficult for the members of the class to redress the wrongs done to them.

- Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.
- The pursuit of Plaintiff's claims, and the claims of the members of the class, in one forum will achieve efficiency and promote judicial economy.
- There will be little difficulty in the management of this action as a class action.

127. Defendants have acted or refused to act on grounds generally applicable to the members of the class, making final declaratory or injunctive relief appropriate.

128. Plaintiff and the members of the Class have all suffered irreparable harm as a result of the Defendants' unlawful and wrongful conduct. Absent a class action, the Class will continue to face the potential for irreparable harm. In addition, these violations of law will be allowed to proceed without remedy and Defendants will likely continue such illegal conduct. Because of the size of the individual Class member's claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.

129. A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants to comply with federal law. The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small because the maximum statutory damages in an individual action for violation of privacy are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

130. Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful conduct.

131. This suit seeks only damages and injunctive relief for recovery of



KAZEROUNI LAW GROUP, APC

economic injury on behalf of Class Members and it expressly is not intended to request any recovery for personal injury and claims related thereto.

## COUNT I

### VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT REGARDING THE NATIONAL DO-NOT CALL REGISTRY 47 U.S.C. § 227(C) AND 47 C.F.R. § 64.1200(C)

132. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

133. Plaintiff and members of the National DNC Class received more than one marketing text message or phone call within a 12-month period, sent by or on behalf of Defendants, for the express purpose of marketing Defendants' goods and/or services without their written prior express consent.

134. At all relevant times, Defendants knew or should have known that their conduct as alleged herein violated the TCPA.

135. Defendants sent at least two unsolicited and unauthorized text messages and/or phone calls to the cellular telephones of Plaintiff and the Class members, cellular telephones which were registered with the National Do-Not Call Registry, for the purpose of marketing goods and/or services to Plaintiff and the Class.

136. Defendants knew that it did not have prior express written consent to send these text messages and/or phone calls, and knew or should have known that it was sending text messages or making calls to cellular numbers on the National Do-Not Call Registry in violation of the TCPA.

137. Defendants willfully or knowingly allowed text messages and/or phone calls to be sent to Plaintiff's and Class members' cellular telephone numbers on the National Do-Not Call Registry. For instance, Defendants could have determined from a review of its own business records and the National Do-Not Call Registry that it could not contact Plaintiff and/or Class members, yet disregarded such information and



KAZEROUNI LAW GROUP, APC

placed illegal and unwanted solicitation text messages and calls.

138. Defendants' text messages and/or calls caused Plaintiff and members of the National DNC Class actual harms including, but not limited to, invasion of their personal privacy, aggravation, inconvenience, nuisance and disruption in their daily lives, reduction in cellular telephone battery life, data, and loss of use of their cellular telephones.

139. Because Defendants knew or should have known that Plaintiff's and Class Members' cellular telephone numbers were on the National Do-Not Call Registry, the Court should treble the amount of statutory damages available to Plaintiff and the other members of the putative Class pursuant to § 227(c)(5) of the TCPA.

140. As a result of Defendants' violations, Plaintiff and the Class Members are entitled to an award of $1,500.00 in statutory damages, for each and every willful or knowing violation, pursuant to 47 U.S.C. § 227(c)(5)(C) or in the alternative an award of $500.00 in statutory damages, for each and every negligent violation, pursuant to 47 U.S.C. § 227(c)(5)(B).

141. Plaintiff and the Class are also entitled to and seek injunctive relief, pursuant to 47 U.S.C. § 227(c)(5)(A), prohibiting such conduct in the future.

142. Plaintiff also seeks an award of attorneys' fees and costs on behalf of Plaintiff and the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, respectfully requests the following relief:

- An order certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as Class Counsel.
- Injunctive relief prohibiting Defendants from engaging in such conduct in the future pursuant to 47 U.S.C. § 227(c)(5)(A);



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

- Statutory damages of $500.00 for Plaintiff and each member the Class for each and every one of Defendants' negligent violations of 47 U.S.C. §§ 227, *et seq*. pursuant to 47 U.S.C. § 227(c)(5)(B);
- Statutory damages of $1,500.00 for Plaintiff and each member the Class for each and every one of Defendants' knowing or willful violations of 47 U.S.C. §§ 227, *et seq*. pursuant to 47 U.S.C. § 227(c)(5)(C);
- Costs of suit;
- An award of attorneys' fees, pursuant to, *inter alia*, the common fund doctrine;
- Pre-judgment and post-judgment interest on monetary relief; and
- All other and further relief as the Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, demands a jury trial on all issues so triable.

Dated: June 2, 2026

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: /s/Ryan L. McBride
Ryan L. McBride, Esq.
ryan@kazlg.com
*Attorneys for Plaintiff*